UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON DREYER,

        Plaintiff,

v.                                            Case Number 05-10285-BC
                                                 Honorable Thomas L. Ludington

EXEL INDUSTRIES, S.A.; KREMLIN-REXSON,
S.A.; EXEL NORTH AMERICA, INC.; EXEL
INDUSTRIAL, INC.; KREMLIN, INC.,

        Defendants.

_____/

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S AND DEFENDANTS' REMAINING MOTIONS**

        On November 4, 2005, Plaintiff Jason Dreyer filed a complaint alleging claims based on product liability after he sustained injuries that he maintains resulted from his use of a paint sprayer. He named as defendants Exel Industries, SA and Kremlin-Rexson SA, identified in this litigation as the "French Defendants," and Exel North America, Inc.; Exel Industrial, Inc.; and Kremlin, Inc., identified in this litigation as the "American Defendants." French Defendants and American Defendants each filed a motion for summary judgment under Federal Rule of Civil Procedure 56. On May 30, 2008, the Court held a hearing on those two motions and entertained oral argument on French Defendants' motion to strike Plaintiff's expert's report as well. Counsel for all the parties attended the hearing.

        At the hearing, the Court also stated that it would address the parties' additional motions calendared for hearing that day on the papers, which included the following motions: (1) Plaintiff's motion to strike American Defendants' motion; (2) French and American Defendants' motions to

strike Plaintiff's expert's supplemental affidavit; (3) Plaintiff's motion to permit French and American Defendants only one legal representative at trial; and (4) Plaintiff's motion to strike American Defendants' witness list. Five motions in limine filed one week before the hearing received no attention, as they were not set for hearing.

I.

On April 14, 2003, Plaintiff Jason Dreyer suffered severe burns to his legs and other injuries after a fire started around 11 p.m. while he cleaned up after painting filing cabinets for his employer, Oakland Schools. The parties do not dispute the following: (1) that Defendant Kremlin-Rexson SA manufactured the paint sprayer in France; (2) that, in America, Defendant Exel North America, Inc., through its predecessor company, Defendant Kremlin, Inc., sold the paint sprayer to a distributor, SprayMax Enterprises (SprayMax); (3) that, in turn, SprayMax sold the paint sprayer to Plaintiff's employer; and (4) that the paint sprayer was about four years old and, thus, purchased in 1999.

Also, based on representations at the hearing, French Defendants are connected through Defendant Exel Industries, SA's partial ownership of Defendant Kremlin-Rexson SA. At the hearing, American Defendants' counsel acknowledged that, for purposes of these proceedings, Defendant Exel North America, Inc. is the successor company to Defendants Exel Industries, Inc. and Kremlin, Inc.[1]

According to Plaintiff's deposition, a man who had previously done similar work, Patrick Downing, spent a few hours training Plaintiff on how to use the paint sprayer. Plaintiff's manager, Jim Williams, provided him with the several user manuals for the paint sprayer. Plaintiff read three

---

[1]For ease of reference, this order will refer to the defendants based on their geographic location, differentiating them further only where the facts or law require separate attention.

or four manuals for the product, which included manuals for the gun, the pump, and the power supply. Prior to the date of the incident, Plaintiff had used the paint sprayer about five or six times.

He painted the cabinets in a windowless room in a basement. The room had one set of double doors that opened to the interior of the building and a vent (with operable louvers) to the outside, located opposite the doors. When he worked, he plugged the paint gun and the compressor into a power strip, so that he could get the extra extension to the electrical cords.

Around 11 p.m. on April 14, 2003, at the end of his evening shift, he closed the louvers on the vent and moved a fan onto the floor. He turned on a radio. He ran a solvent, methylethylketone (MEK), through the paint sprayer to clear it out. The paint sprayer power supply box and its air compressor remained plugged into a power strip. While wearing rubber-soled shoes, he used his foot to switch off the power strip. A spark was emitted, and the spark ignited a ball of fire. His pants caught fire, and he fled the room. He managed to remove his pants and contacted security, which called the fire department. Upon returning to the room with a fire extinguisher, he quickly left, because the flames were too great.

Plaintiff maintains that, before the fire, he inquired through American Defendants' technical help line about consistent difficulties with operating the paint sprayer. According to him, American Defendants' representative suggested that he use a stronger solvent than paint thinner to clear out the lines in the paint sprayer. He also states that the paint sprayer was sent to American Defendants for repair. American Defendants offered no basis to contradict Plaintiff's description of his inquiries to them.

Contrary to Plaintiff's suggestion in his brief, the man who trained him to use the paint sprayer indicated that MEK was for use only to thin the paint. According to the trainer's deposition,

MEK would not be used to clean the paint sprayer, and no one from SprayMax or anywhere else told him to use MEK for that purpose. According to the deposition of a representative of French Defendants, Jen-Luc Colin, however, their paint sprayers can be cleaned with MEK, under some circumstances.

A paint sales engineer who previously worked for SprayMax, Michael McShane, testified that he would recommend against using a paint sprayer with a power strip. The power strip, because it is an open power source, creates a risk of releasing a spark amidst a paint spraying environment. Similarly, Defendant Kremlin-Rexson SA's general manager (or president),[2] Daniel Tragus, testified that using a power strip in an environment that had a high concentration of flammable solvent would be dangerous. Use of an extension cord, however, would not necessarily be dangerous.

After investigating the fire, Waterford Township's fire marshal, Frederick Arnold, testified that the room contained at least six five-gallon cans of MEK and other smaller cans. He indicated that some of those cans were not properly sealed. In his view, he would not have approved the painting operations, as they there existed, as compliant with the township's codes. He concluded that the MEK vapors ignited when Plaintiff turned off the power strip. The fire marshal stated that the fire originated there. According to his report, an electrical arc, released by switching off the power strip, ignited the vapors.

Plaintiff's employer's insurer, Set-Seg Insurance Company,[3] created a report on April 30, 2003 regarding the fire. Its fire investigator, Al Wehrli, concluded that the fire originated at the

---

[2]His precise title appears to be a point of translation difficulty, but it seems that he is Defendant Kremlin-Rexson SA's highest ranking official.

[3]The insurer has entered an appearance as an intervenor.

power strip and that a spark from turning off the power strip (or from unplugging a socket) ignited paint and solvent fumes present in the painting area. According to the investigator, the paint sprayer did not cause the fire.

Tragus, of Defendant Kremlin-Rexson SA, acknowledged that his company continues to manufacture in France the type of product at issue here and that, at the time of the sale of the instant product, such products were sold to Defendant Kremlin, Inc. in America. According to him, the type of product at issue here was designed in France, and its user's manuals were written there. He also stated that the manuals did not describe any requirement to use so-called "explosion-proof" switches.[4] He explained that his company sold units to its American subsidiary, who placed orders that Defendant Kremlin-Rexson SA would fill. He also stated that, in 1999, Defendant Kremlin-Rexson SA was a majority shareholder of Defendant Kremlin, Inc. (At that time, according to Colin, a representative of Defendant Kremlin-Rexson SA, the company may have been simply Kremlin, SA, prior to its joinder with Rexson.)

The manual for the paint gun included the following warning:

Storage of paint and solvent drums near or inside the spraying area is prohibited. Keep all fluid containers properly closed in a non-hazardous area.

**Use cleaning solvents with the highest flash point – If possible, higher than the ambient temperature.**

*Paint Gun Manual*, p. 4; Fr. Dft. Br., Ex. 3 [dkt #102-4].

The manual later states:

**Caution !**

---

[4]The manuals referred to European safety standards, which were not included with the manuals.

> **A typical installation designed to spray non-flammable conductive material (water-based paints) must not be used to handle flammable material (solvent-based paints).**
>
> **The risks are . . . explosion, fire, electric shock hazard and serious body injury for the personnel.**
>
> **In case of doubt, do not start-up your electrostatic coating system, but consult immediately your local authorized KREMLIN distributor for assistance.**

*Id*. at p. 19; *see also id*. at p. 21 ("Any improper installation or misuse of the electrostatic coating system can cause serious body injury, fire, explosion, or electric shock hazard.").

As part of the general safety instructions, the manual directs that the power supply unit "must be installed in a non-hazardous area . . . [and] be located 4 meters (13 ft) at least away from any flammable vapour emissions." *Id*. at p. 3. Similarly, a safety placard for the paint gun states:

> **Do not reconnect** the electrostatic coating equipment until after the cleaning operation **has been completed** and vapors generated in cleaning **have been removed** by ventilation.

*Safety Placard*, #9; Fr. Dft. Br., Ex. 6 [dkt #102-7].

Plaintiff's proposed expert, Dr. Nathan Dorris, in a report from November 30, 2007, concluded that these safety messages and warnings were not sufficiently explicit, particularly regarding the use of surge protectors or power strips. *See Dorris Report*, pp. 4-6; Pl. Rs. to Fr. Dft., Ex. E [dkt #129-6]. Plaintiff's expert expressed his view that these deficiencies directly caused the fire and Plaintiff's injuries. Near the beginning of his statement of his opinions, Plaintiff's expert also described his knowledge of the requirements to operate a paint sprayer safely and effectively:

> It is my understanding that electrostatic spraying and coating can be performed safely only when elaborate precautions have been taken. These precautions include the installation of a spray booth, which is a power-ventilated structure to confine and exhaust the flammable or otherwise dangerous vapors and mists present during typical operation and cleaning.

-6-

*Id*. at p. 4. Plaintiff's expert does not identify the basis for this understanding, nor do the parties identify any supporting material to indicate that operation of the paint sprayer required these particular precautions.

No party disputes that the MEK was purchased from Sherwin-Williams or that MEK is highly flammable and has a low flashpoint. That is, it can ignite at a very low temperature, and Plaintiff expressed his awareness of its volatility. Also, the Sherwin-Williams products contained several warnings about the hazardous nature of those materials.

Regarding Defendants' respective corporate structures and relationships, French Defendants have the same president but are separate companies. American Defendants' president, Jean Patry, stated that products are shipped to American Defendants' warehouse where they are assembled before distribution. He also testified that, when the paint sprayer at issue here was sold, Kremlin, SA owned 100% of the American company that sold it.

Plaintiff makes a variety of assertions about the ownership and structure of Defendants, both currently and at the time of the sale, and provides some record citation for these assertions. Apart from the vigor that he invests in asserting the obviousness of the interconnections between French Defendants and American Defendants, he offers little record evidence to support his contention that American Defendants are but a department or division of French Defendants.

Plaintiff provided a video recording that purportedly shows a celebration for the opening of American Defendants' new headquarters in Livonia, Michigan. Plaintiff represents that the video shows American Defendants' president welcoming Patrick Ballu, president of Defendant Exel Industries, SA, his family member and fellow shareholder, Guerric Ballu, and Defendant Kremlin-Rexson SA's general manager (or president). Even if these French Defendants owned a substantial

portion of American Defendants – which a video recording does not demonstrate – substantial ownership still does not demonstrate a disregard for the corporate form of American Defendants. Plaintiff's contention that a particular family represents a "dynasty" does not, of itself, show control of American Defendants sufficient to conclude that they are no longer separate legal entities from French Defendants.

Plaintiff does cite to American Defendants' application to conduct business in Michigan, which describes its endeavors as follows, "To invent, manufacture, import, assemble, sell, distribute, export, install, service, maintain and generally deal in and with, at wholesale and retail, painting equipment of all kinds, together with all components thereof and all articles related thereto." Pl. Rs. to Amer. Dfts.' Mot., Ex. M [dkt #139-14]. This statement, however, dates from 2006, which post-dates Plaintiff's injuries.

Plaintiff has now filed an amended complaint against Defendants. He advances two claims: negligence or gross negligence, which he describes by reciting several product liability theories, and breach of warranty, in which he also recites several potential theories of liability.

II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley*

*Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must do more than simply show that there is some "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (citations and internal quotations omitted).

### III.

Mich. Comp. Laws § 600.2945(h) authorizes products liability claims based on death or injury to a person "caused by or resulting from the production of a product." "Production" of a product is defined broadly and includes manufacture, construction, design, standards development, testing, warning, instructing, marketing, selling, advertising, packaging, and labeling. Mich. Comp. Laws § 600.2945(i). "[A] plaintiff relying upon [a theory of products liability] must prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains." *Prentis v. Yale Manufacturing Co.*, 365 N.W.2d 176, 181 (Mich. 1985) (citations and internal quotations omitted). Courts have refused to make sellers insurers of their products and, so, absolutely liable, but courts have also concluded that manufacturers can most ably bear and distribute the cost of any injuries. *Id.*

### A.

Mich. Comp. Laws § 600.2947(6) provides:

> In a product liability action, a seller other than a manufacturer is not liable for harm allegedly caused by the product unless either of the following is true:
> (a) The seller failed to exercise reasonable care, including breach of any implied warranty, with respect to the product and that failure was a proximate cause of the person's injuries.
> (b) The seller made an express warranty as to the product, the product failed to conform to the warranty, and the failure to conform to the warranty was a proximate cause of the person's harm.

Thus, a seller who is not the product's manufacturer faces liability for a defective product only if

the breach of an implied or express warranty proximately caused the injury. *Accord Coleman v. Maxwell Shoe Co., Inc.*, 475 F.Supp. 2d 685, 691 (E.D. Mich. 2007) (refusing to find liability against department store that sold allegedly defective shoe, because of store's status as non-manufacturing seller). In *Grostic v. AGCO Corp.*, 2003 Mich. App. LEXIS 50 (Mich. Ct. App. 2003), liability did reach both the distributor and the manufacturer of a product, but that decision turned on other legal principles and did not consider Mich. Comp. Laws § 600.2947.

Here, Plaintiff offers no evidence to contradict the assertion that French Defendants manufactured the item in question and created its manuals. Defendant Kremlin-Rexson SA's president and another of its representatives testified that their company, or its predecessor, manufactures this type of item in France. They offered no reason to believe that the paint sprayer here had a different origin. Most importantly, Plaintiff cites to this same testimony to support his claim against American Defendants. Accordingly, he does not provide any basis for concluding that American Defendants fall outside the scope of Mich. Comp. Laws § 600.2947(6).

American Defendants are non-manufacturing sellers, who sold the product to SprayMax, which sold the product to Plaintiff's employer. Consequently, American Defendants cannot be liable for a product liability claim under state law, notwithstanding an appellate decision in *Grostic*. There, a non-manufacturing distributor incurred liability, but where the court decided that case on unrelated grounds and never addressed the issue.

Plaintiff seeks to overcome this bar by insisting that American Defendants are but a division of French Defendants. To do so, Plaintiff relies only on a Sixth Circuit decision, *Bathory v. Proctor & Gamble Distributing Co.*, 306 F.2d 22 (6th Cir. 1962), in which the court refused to permit a wholly owned subsidiary-distributor to escape liability by pointing to its parent company's status

as the manufacturer. The companies had nearly identical names and the same principal place of business, and the subsidiary contractually agreed to buy all of the parent's products. The parent had the right to designate the number of units sold, the subsidiary sold the products without a profit, and the subsidiary received payment in the form of a credit from the parent. The contract required the subsidiary not to sell products without the parent's consent, and the sole identification on the product packaging did not differentiate between parent and subsidiary.

Here, Plaintiff has not marshaled facts sufficient to support a similar conclusion regarding the relationship of French Defendants and American Defendants. Plaintiff relies on the spelling of the companies' names and American Defendants' acknowledgment in an earlier filing that they were, at one time, a wholly owned subsidiary of French Defendants. Yet the *Bathory* decision, even if it were governing authority, required far more than mere ownership to conclude that an identity existed between the parent and subsidiary. Plaintiff, however, has offered little more than those bare assertions, as well as the appearance of shareholders and leadership of French Defendants at an event for American Defendants. Indeed, counsel for American Defendants represented at the hearing that they sell products other than those manufactured by French Defendants. Also, Plaintiff has not attempted to isolate which French Defendant owned what American Defendant when, so as to more precisely connect the supposed parent with the supposed "division" to the occurrence of the cause of Plaintiff's injuries.

Plaintiff also suggests that American Defendants did not purchase the products on the open market and that a letter from the "lead specialist" (presumably at Defendant Kremlin-Rexson SA) held out American Defendants as a manufacturer of Defendant Kremlin-Rexson SA's products. Plaintiff provides no record citation for these assertions, apart from a deposition question to Jean

Murray, an employee of Defendant Exel North America, Inc. Although not perfectly clear in context, it appears that she had a title beneath her name on letterhead or in an e-mail signature that identified her as "Lead Specialist, EXEL North America, Inc., Manufacturer of Kremlin-Sames and Rexson-Kremlin." *Murray Dep.*, Pl. Rs. to Amer. Dft., Ex. Murray [dkt #110-26]. Plaintiff does not cite to a copy of this correspondence. Nor does he date the correspondence, so as to indicate that any conclusion about corporate structure (that might follow from a signature line in an employee's e-mail) corresponds to that structure at the time of the incident. Plaintiff, thus, does not make a showing, or raise a question of fact, that American Defendants should, in point of law, be considered but a division of French Defendants. Without such a showing, he has not provided a basis for the Court to disregard the plain language of Mich. Comp. Laws § 600.2947(6), where American Defendants are non-manufacturing sellers.

Alternatively, Plaintiff seeks to pierce the corporate veil of American Defendants. Presumably relying on his above attempts to show the connection between American Defendants and French Defendants, he proceeds to assert the following:

> [American Defendants are a distributor and] also provide servicing and technical support. They are knowledgeable in warnings. The identity is so clear that the 'veil' is transparent. Here, 'piercing the corporate veil' is hardly necessary, because it so obvious that [American Defendants] and the principal designing, manufacturer, exporter and [American Defendants] are, in fact, one in the same.

Pl. Rs. to Amer. Dft., p. 14 [dkt #110]. Again, assertions without citation to evidentiary support do not show, as a matter of fact, that American Defendants should be treated as if they have a singular identity with French Defendants. The above quote, which is the totality of Plaintiff's argument, does not prove his argument. Nor do other details, such as a video recording that purportedly shows major shareholders and/or directors or officers of French Defendants at a celebratory event for

American Defendants, close that gap. *See id.* at Ex. O.

Finally, Plaintiff attempts to invoke the implied warranty exception provided in Mich. Comp. Laws § 600.2947(6)(a). According to him, "[t]he spray gun was[,] as designed and delivered, unfit for its purpose and caused an explosion." *Id.* at p. 23. At no point, however, does Plaintiff identify how, in particular, the paint sprayer was unfit for its purpose. He appears to rely on the fact of an explosion as demonstrative of the paint sprayer's purported lack of fitness, indicating generally that "paint was dripping everywhere" and that American Defendants' technical representative had recommended the use of MEK. *Id.* Despite the severity of Plaintiff's injuries, the mere fact of a harmful event does not show the lack of fitness of the product and, thus, the applicability of an exception to the bar to liability for non-manufacturing sellers. Plaintiff proceeds to conflate theories of a duty to warn and the exercise of reasonable care with his argument that American Defendants breached an implied warranty. Because those legal theories are unrelated to a breach of an implied warranty, American Defendants' conduct on those points is not relevant to determining whether they can avoid the bar of Mich. Comp. Laws § 600.2947(6). Without a genuine issue of material fact regarding a breach of an implied warranty, Plaintiff cannot show his entitlement to the exception that would permit him to proceed against American Defendants.

Accordingly, the Court will grant American Defendants' motion for summary judgment on Plaintiff's claims. His claim of negligence is barred by Mich. Comp. Laws § 600.2947(6), and he has not supported his claim of a breach of an implied warranty by providing some factual basis to show a defect in the product and a connection between that defect and his injury.

B.

Regarding French Defendants' motion for summary judgment, "[m]anufacturers have a duty

to warn purchasers or users of dangers associated with the intended use or reasonably foreseeable misuse of their products but the scope of the duty is not unlimited." *Glittenberg v. Doughboy Recreational Industries*, 491 N.W.2d 208, 211-212 (Mich. 1992). In a failure to warn case, a plaintiff must show the following elements: (1) the manufacturer had a duty to provide a warning; (2) the manufacturer breached that duty; (3) that breach caused the plaintiff's injury; and (4) the plaintiff suffered an injury. *Tasca v. GTE Products Corp.*, 438 N.W.2d 625, 627 (Mich. Ct. App. 1988). More specific to the element of duty is the plaintiff's obligation to establish that a manufacturer had actual or constructive knowledge of the alleged danger, had no reason to believe that consumers would know of that danger, and failed to exercise reasonable care to inform consumers of that danger. *See Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 741 (6th Cir. 2000) (citing *Glittenberg*, 491 N.W.2d at 212-213).

Regarding causation, a plaintiff must show both causation in fact and proximate cause. *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994) (citations omitted); *see also Brisboy v. Fibreboard Corp.*, 418 N.W.2d 650, 653 (Mich. 1988) (applying this standard to a case involving failure to warn of the dangers of asbestos exposure). "Cause in fact" requires a showing that "but for" a defendant's actions, a plaintiff's injury would not have occurred. *Skinner* 516 N.W.2d at 479 (citing Prosser & Keeton, Torts (5th ed.), § 41, p. 266). "[L]egal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id*. If several factors produce an injury, a defendant's conduct is a proximate cause of that injury only if it was a "substantial factor" in producing the injury. *Brisboy*, 418 N.W.2d at 653 (citations omitted).

Regarding warnings in product liability actions, Mich. Comp. Laws § 600.2948, in relevant

part, provides:

> (1) Evidence is admissible in a product liability action that, before the . . . injury to the person . . . , pamphlets, booklets, labels, or other written warnings were provided that gave notice to foreseeable users of the material risk of injury, death, or damage connected with the foreseeable use of the product or provided instructions as to the foreseeable uses, applications, or limitations of the product that the defendant knew or should have known.
> (2) A defendant is not liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury . . . the claim is based in a product liability action.
> (3) In a product liability action brought against a manufacturer or seller for harm allegedly caused by a failure to provide adequate warnings or instructions, a manufacturer or seller is not liable unless the plaintiff proves that the manufacturer knew or should have known about the risk of harm based on the scientific, technical, or medical information reasonably available at the time the specific unit of the product left the control of the manufacturer.

Thus, a defendant has a defense based on warnings that give notice of risks of injury from foreseeable uses to foreseeable users, and a defendant does not face liability for failing to warn of a risk that is obvious to a reasonably prudent person and that is a matter of common knowledge to those in a similar position. *See, e.g., Greene v. A.P. Products, Ltd.*, 717 N.W.2d 855 (Mich. 2006) (refusing to find liability against a manufacturer of hair oil that did not provide a warning against ingesting the product). Also, the plaintiff must show that a manufacturer knew or should have known of the risk based on information reasonably available at the time that the product left the manufacturer's control. Mich. Comp. Laws § 600.2947(3).

As to the existence or content of a warning itself, "the adequacy of a warning is an issue of reasonableness, and reasonableness is a question of fact." *Bouverette v. Westinghouse Electric Corp.*, 628 N.W.2d 86, 90 (Mich. Ct. App. 2001) (citations omitted). The question of a duty to warn, however, is an issue of law for the court's determination. *Antcliff v. State Employees Credit Union*, 327 N.W.2d 814, 821 (Mich. 1982). Courts consider the adequacy, accuracy, and efficacy

of warnings for the safe use of a product in assessing whether they meet the standard of care. *See Pettis v. Nalco Chemical Co.*, 388 N.W.2d 343, 348 (Mich. Ct. App. 1986) (citations omitted). Manufacturers, however, are not required "to warn of the hazards of using products manufactured by someone else." *Brown v. Drake-Wilcock Int'l, Ltd.*, 530 N.W.2d 510, 515 (Mich. Ct. App. 1995) (citation omitted).

Here, French Defendants advance several arguments. They insist that their product, the paint sprayer, was not the cause in fact of the fire, but that the interaction of the MEK vapor and the electrical spark from the power strip caused the fire. They also assert the adequacy of the warnings included in their materials and maintain that they had no obligation to warn of a risk of danger associated with the combined use of two other manufacturers' products, i.e., Sherwin-Williams' MEK and the manufacturer of the power strip.

Plaintiff responds that French Defendants failed to provide warnings regarding the use of a power strip or the use of MEK. He also faults them for not including the European safety standards that the materials reference and compares the instant manuals to the safety manuals of other vendors, which allegedly provide clearer warnings. Ultimately, he insists that the adequacy of French Defendants' warnings is a fact question for the jury.

Regarding causation, the evidence supports French Defendants' contention that the paint sprayer was not the cause in fact of the fire. Both the fire marshal and the insurer's fire investigator concluded that the fire resulted from an electrical spark, discharged when Plaintiff turned off the power strip with his foot. The fire marshal and the fire investigator determined that that spark ignited the MEK vapors.

Plaintiff has offered no evidence to contradict the fire marshal's and insurer investigator's

shared conclusion that the cause of the fire was a spark igniting MEK vapors. Absent any contrary showing, no genuine issue of material fact remains as to proximate causation. Plaintiff argues that but for the use of the paint sprayer, which required electricity for its operation and also necessitated use of a cleaning product, the fire would never have started. Even if that but-for causation existed (which requires disregarding the fact that Plaintiff was operating both a radio and a fan in the room in which he was painting), the flow of electricity to the paint sprayer was not a significant factor in the causal equation resulting in the fire. The presence of the vapors, the limited or lack of ventilation for those vapors, the use of the particular power strip, and Plaintiff's act of switching off the power strip constitute the significant factors, as described by the fire marshal and the fire investigator. The foreseeability of the consequences of the interaction of a spark with MEK vapors is well-documented by the warnings on the MEK container and Plaintiff himself acknowledged his understanding of the solvent's volatility. Most importantly, however, the foreseeable consequences at issue here involves products other than the paint sprayer: MEK and a power strip. While ill effects could be foreseen for the mishandling of the MEK, the effect of the presence of the paint sprayer on the explosion is tangential at best. Consequently, the explanation of causation offered by the fire marshal and the fire investigator – uncontested by Plaintiff – leaves no room to conclude that the paint sprayer was a proximate cause of the fire. Without the element of causation, Plaintiff cannot sustain his claim.

Plaintiff also suggests that he used MEK at the suggestion of American Defendants' technical help line. First, as described above, Plaintiff has not shown a legal basis for imputing to French Defendants the alleged conduct of American Defendants. Second, Plaintiff does not assert that American Defendants' technical help line directed him to store the MEK in the room in which

he was painting or to leave five or more cans of it available to the air. Even if such an instruction could be linked to the presence of MEK vapors in the room, the proximate cause connection to the fire suffers in light of the several warnings on the MEK container to handle the volatile product with care.[5] Indeed, during his deposition, Plaintiff acknowledged his understanding of the solvent's volatility. Third, a manufacturer bears no obligation to warn of the risks of other manufacturer's products. *See Brown*, 530 N.W.2d at 515. Consequently, even if he used the MEK at American Defendants' suggestion, he still has not raised an issue of fact regarding the necessary element of causation.

Accordingly, the Court will grant French Defendants' motion for summary judgment, because no genuine issue of material fact remains regarding the element of causation and, more specifically, a showing of proximate causation. Plaintiff has offered no evidence to challenge the fire marshal's and insurance investigator's conclusion that an electrical spark from a power strip ignited MEK vapors to cause the fire. Neither the power strip nor the MEK are French Defendants' product, and Plaintiff elected not to name the manufacturers of either the power strip or the MEK

---

[5]The MEK container bears a red diamond that indicates the presence of a "FLAMMABLE LIQUID" under an icon of a flame. The label further warns:

> DANGER! EXTREMELY FLAMMABLE – VAPORS MAY CAUSE FLASH FIRES! . . .
>
> Contents are **EXTREMELY FLAMMABLE**. Keep away from heat, sparks, and open flame. Vapors will accumulate readily and may ignite explosively. During use and until all vapors are gone: keep area ventilated – Do not smoke – Extinguish all flames, pilot lights and heaters – Turn off stoves, electric tools and appliances, and any other sources of ignition.
>
> **VAPOR HARMFUL**. Use only with adequate ventilation. . . .

*MEK Label*, Fr. Dft. Br., Exs. 7-9 [dkt #102-8].

as defendants.

IV.

Accordingly, it is **ORDERED** that French Defendants' motion for summary judgment [dkt #102] and American Defendants' motion for summary judgment [dkt #110] are **GRANTED**.

The following motions are **DENIED** as moot: (1) Plaintiff's motion to strike American Defendants' motion [dkt #124]; (2) French Defendants' motion in limine to strike Plaintiffs' expert's report [dkt #103]; (3) French and American Defendants' motions to strike Plaintiff's expert's supplemental affidavit [dkt ##133, 151]; (3) Plaintiff's motion to permit French and American Defendants only one legal representative [dkt #158]; (4) Plaintiff's motion to strike American Defendants' witness list [dkt #161]; (5) French Defendants' motion in limine [dkt #170]; (6) Plaintiff's motion in limine [dkt #171]; and (7) American Defendants' motions in limine [dkt ##172, 173, 174].

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: June 10, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 10, 2008.

s/Tracy A. Jacobs  
TRACY A. JACOBS

---